5-17-0359 Warren Spann v. The Workers' Compensation Commission Counsel, you may proceed. May it please the Court, Mr. Wirtz, my name is Bruce Cressore and I represent Warren Spann. I want to paraphrase what a wise man once told me. If I had more time, I could have written a shorter argument. I'm going to do the best I can here because there's only two issues that I want to talk to you about. Well, this man's PFT is normal. And second, what's the relationship of CWP to Section 1F? I think this is what I'd call a case of runway lights. I don't think I've ever seen a decision so much against the evidence. This man was an underground coal miner for 31 years and a lifelong never smoker. The examining expert for the employer was Dr. Selby. Bee readers were Meyer and Wren. The claimant's expert was Dr. Paul. His bee reader was Dr. Smith. And there was also a treating pulmonologist, Dr. Eagleton of Springfield here. Now, Dr. Paul diagnosed CWP, restrictive disease, obstructive disease, and a decreased diffusing capacity. He related all of that to mining. Dr. Selby said that all of the claimant's pulmonary function testing was normal. And that's all that's needed for a claimant to meet his burden. Here were the PFTs. In 2011, the year before this man quit mining, Dr. Eagleton examined it. His FDC was 73%. His FDD was 71%. In January 2013, the year after he quit mining, Dr. Paul examined him. His FDC was 60%. FDD 162. In 2013, Selby examined him, and his FDC was 78. FDD 178. Both Dr. Paul and Dr. Selby found his diffusing capacity to be abnormal, to be low. Dr. Eagleton didn't measure it. Now, the court could take judicial notice that under the AMA guides, 6th edition, for either the FDC or the FD1, anything below 80% is impaired. Of eight measurements of lung function, two while he was still mining, and six after he quit, every single measurement showed impairment by the AMA guides. Dr. Eagleton found obstruction and restriction. Dr. Paul, obstruction and restriction. And Selby said everybody's testing was normal. Something's wrong. Eight out of eight abnormal measures, and Selby said the testing was normal. If that's not against the manifest weight of the evidence, it's hard to get there. What did Dr. Meyer opine? What was his conclusion? He talks about CWP, not the PFTs. And that's the second half of my argument is the CWP. The one that talks about CWP is Selby. That's the only guy for the employer. So my point here is since all eight pulmonary measures are impaired under the AMA guides, the commission's decision is wrong, not just as a matter of fact, but also as a matter of law. Even Selby admitted that his opinion was that the testing of Dr. Eagleton was abnormal under the AMA guides. But he said that his interpretation wasn't based on the AMA guides, but on the standards of the way he looks at PFTs. He didn't even cite any other standards. He only cited himself. Two out of three pulmonologists, one a treater, say the testing shows both obstruction and restriction. That's a preponderance of the evidence. In terms of credibility, given Dr. Selby's testimony on the PFTs, I believe the arbitrator's decision was against the manifest weight of the evidence and to the extent it was hostile to the AMA guides, it was wrong as a matter of law. In this case, based solely on the objective testing, Dr. Selby can have no credibility on the issue of disablement. And if he couldn't find any pulmonary impairment or disablement, he couldn't find any disease. So he couldn't have any credibility there either. If Selby's found to be credible, if these PFTs are found to be normal, there are no standards again. We go backwards. There's no way to develop a case. Based on this alone, claimant's met his burden. He's won his case. This 31-year underground coal miner who's a lifelong never smoker with pulmonary impairment, both before and after he left mining, by 100% of the objective measures has lung disease. And it's related to the only thing in the record that it could be related to, coal mining. He had no other exposures. Now for the CWP. Claimant also carried his burden on CWP, and he has to carry it on one of the two to prevail, either one or both. First, the legal question claimant must answer regarding CWP is, did he have it within two years after his date of last exposure? That takes in Section 1F, and that's what I'm going to be talking about, this whole CWP argument. His date of last exposure was January 3, 2012. Therefore, his CWP had to be present by January 2, 2014. Both Selby and Rem testified that CWP can first manifest itself on x-ray more than two years after the date of last exposure. Dr. Meyer said it could first manifest itself a year after the date of last exposure. Therefore, under this record, no x-ray taken prior to the running of 1F, which would be January 2, 2014, can prove or even indicate an absence of CWP, even if it were accurately read as negative. However, the Commission based its denial, at least in part, on a NIOSH x-ray taken in 2002. That's 10 years before the guy left mining, 12 years before Section 1F runs, which is his real date that he has to worry about. Claimant contends that the NIOSH x-ray was untimely and irrelevant. He further claims that all NIOSH screening x-rays, inasmuch as they're taken while the mine are still working, are irrelevant as a matter of law. Can I ask you a question? Yes. Who says that an opinion of an expert is erroneous as a matter of law merely because they don't subscribe to the AMA guidelines? Is there a case that says so? I'm working on a statute there, Your Honor. Where does the statute say? It says that the AMA guides are to be considered. But it doesn't mean that they're the end-all, be-all if the expert doesn't rely on them. Your own witness, Paul, didn't rely on them. He used a CAPRO, CARPO, in predicting and interpreting pulmonary function testing. CAPRO was the standard used by the AMA guides, the fifth edition. Sometimes the guy sets his computer on the wrong thing. I'm not basing my argument on saying Dr. Paul is using the right one. You're correct. But what I'm saying is if the commission doesn't use the AMA guides, they should tell you why and what else they're using. It was a great day for claimants and for employers when the AMA guides, sixth edition, got put in there. Because before that, well, the pulmonary analysts would say, I used Knudsen, I used Spearman, I used whatever standards there were that may artificially make it look higher or lower. And after he got finished saying what standards he used, he could say, and by the way, 70% is normal. So the standardization that the AMA guides put in is very important. Sometimes it hurts me. Sometimes it helps me. But when I'm putting a case together and I'm talking to the client, I can tell them, well, your PFPs are normal. Your PFPs are not normal or they're barely normal. It also tells us how much. Now, what happened on the CWP here is that Dr. Meyer, so the NIOSH x-rays are out. Then we get to Dr. Meyer. And he read two x-rays, one from October of 2009, one from March of 2012, and two CT scans, one from October of 2009 and one from November 2010. All four of those are irrelevant. Why? Because it's a mirror image, what I have to prove and what Mr. Wirtz has to prove. I have to prove, and my proof doesn't have to be within the period, but I have to prove that within that period he had CWP. Mr. Wirtz has got to prove that, no, he didn't. It wasn't within the two years. Wait, does Mr. Wirtz has a burden? I think it's a burden by implication. I have to prove it. Well, maybe it's not the best choice of words. I thought the burden was on the claimant. Well, it is, but in a light switch situation, in an on or off, I put up evidence that he has it. The way I don't prevail is he puts up evidence that the guy doesn't have it. Under those circumstances, perhaps, but not generally speaking. He doesn't have to prove it. Articulated in a better fashion, yes. He must prove me wrong because I've stated my case. I never come up without having a bee reader and a pulmonologist, and then he starts his work. To do what? To prove I'm wrong. So he either climbs that ladder or he doesn't. So, anyway, all of the x-rays of Dr. Meyer were before, at least one year before, one f-rank. So there was still time for Petitioner to develop a positive x-ray. Doesn't it go more to the weight to be given to the evidence than its relevancy and admissibility? It's a weight question, isn't it, when you say that? I don't think so, Your Honor. Well, it can't come into evidence? Pardon me? It can't come into evidence? It's an improper factor to consider? Well, again, here, I'm inarticulate. I guess it can come into evidence, but if it's considered, then it's wrong and it's good for me. Because I have to prove within Section 1F, no question, I've got to prove within Section 1F. The other side, what they've got to prove is, no, I'm not right. It didn't happen within Section 1F. They can prove that I had CWP, but I had it three years after I got out, and I lose. So it is a mirror image of what we have to prove, and that the dates mean something. Section 1F is very clear. Two years exactly from the date of last exposure. Can I ask you a question? Section 8.1A of the Act requires or states that the ABA, the most current edition or guides, is abused to determine the level of impairment when determining permanent partial disability. One of the statutes says, does it say that the guidelines are supposed to be used in determining whether there's an occupational disease at all? It's a matter of the dominoes falling, Your Honor. If you come into my office, you want to have a case, and all your PFDs are normal, well, then I better prove CWP. Could my PFDs be abnormal if I was a heavy smoker, three packs a day? Sure it could be, but that's my point. Your Honor, if I find there's an impairment, if I find there's a disablement, then I look for the disease that caused it. But if I don't have an impairment, then I'm not going to look for COPD. I may look for chronic bronchitis because you can have that on the call. If it's determined that the guy has an occupational disease, then the statute requires that the ABA guides be used to determine the level of impairment. But I find nothing in the statute that says that the AMA guidelines are to be used to determine whether it's an occupational disease, as opposed to a non-occupational cause. Okay, causation is not what I was talking about at this moment. What I was talking about is Dr. Selby says all the PFDs are normal, all eight measures. The AMA guides say all eight are abnormal. Except one thing is Dr. Selby did agree that the diffusion capacity was abnormal. That's enough. That's all I need to get in to have an abnormal PFT. So when you're looking for that disease, you can find a guy that comes in, he's got the real bad PFDs, and they try to find the disease. This guy's a lifelong never smoker. So we're going to have a hard time finding some of that disease. But like I said, Section 1F works both ways. The claimant has to prove some kind of disabling within the Section 1F. With radiographic studies, under the universal testimony in this case, the employer must prove an absence of CWP at any time within that two-year 1F period. And so when the employer brings in all X-rays that occur before 1F runs, there's no evidence to say that it couldn't have occurred between that time and the running of 1F. This is kind of a mathematical calculation. It takes it out of speculation. I don't see anything in the Act that says Section 1F is only applicable when used against the worker. As a result, both Dr. Wren's X-rays are irrelevant. So what you end up with is Dr. Meyer's are irrelevant by time. Dr. Wren's are irrelevant by time. NIOSH is irrelevant by time. And when the other side is left with no X-rays, even Dr. Selby's exam was a year before 1F ran. So you have an absence of X-rays on the other side that would show that this incident happened. Counsel, I have a question. The pre-final exposure date or the last exposure date, the tests that are performed, the industry tests that are performed before that date, are you saying they have no evidentiary value? If it was positive, they do because it never goes away. If it's negative, they don't because the universal testimony is you can still get it. It can occur after you leave the coal mine. And one of the reasons is that Dr. Meyer said that, in fact everybody says that when you have coal dust that you breathe in over your 30 years of coal mining, a lot of it stays trapped there for the rest of your life. And Dr. Meyer said as much as 50% of the weight of the lungs can be trapped coal mine dust. That means that the tissue next to that trapped coal mine dust is exposed to coal mine dust for the rest of your life. Hence, CWP is a latent and progressive disease. Coal mine induced lung disease is latent and progressive because the exposure never ends. Now, you mentioned that I believe there was testimony concerning waxing and waning of the test results. I think one result showed that there was 75% or I forget the total amount of the lungs that the doctor found would have had been affected by coal dust or found the test came out positive. But then two years later, it was a lesser amount. Now, you said once it's there, it's there. It doesn't go away. How do you explain? I mean, how is that not relevant? Finally, I got one that I think I can handle. The disease is permanent. It stays there. X-rays change. In fact, if I could take a picture. You know, you take a picture two years later, it's the same thing. Is it going to look exactly the same way? Do you have a different film, a different guy taking it, a different location? And then just the fact of clarity. You could take it to the same place and it could be different. So the real clue is that they were found positive by the guy reading it. Not that it's exactly the same. Thank you. Thank you, counsel. We have time to reply. Counsel, you may respond. Excuse me. May it please the court, Mr. Wiseauer. My name is Ken Wirtz and I represent the appellee. Let me begin with the issue about co-workers, the meconiosis and the chest imaging here. This gentleman's date of last exposure is alleged to be January 3, 2012. The oldest film we have that anybody interpreted is March 28, 2012. Dr. Smith interpreted that film. Dr. Paul interpreted a film that we don't know the date of because he did not know the date of. But for purposes of this argument, let's just say it was that film. So you have two interpretations of that film that are positive in total. There were four positive interpretations of chest X-rays, three of them being B readings, if you accept the date for Dr. Paul's interpretation. On the employer's side, there were 10 negative interpretations of chest X-rays, and they were all B readings. So there isn't a film after March 28, 2012. Mr. Wiseauer argues, well, this gentleman could have developed meconiosis after that date. The problem is there isn't any evidence after that date. So just as I can't point to a chest X-ray taken in 2014 as being negative, he can't point to one as being positive, because the last film is March 28, 2012. I think the clear preponderance of evidence, and this is a manifest weight issue, or should I say that there was sufficient evidence in the record that there was no evidence of In this case, I actually had Dr. Wren, who is a B reader, take that last film that was taken of this gentleman that we have, Mr. Wiseauer and I, to NIOSH and pull their original film from 10 years earlier, specifically to look at them side by side to see if there was any change in that film over time. And there wasn't. So the NIOSH film is of value because it was used for comparison purposes. He's the only physician that did that. And as I say, I believe that there was sufficient evidence that meconiosis was not present. And Justice Hoffman, you're absolutely correct that the AMA guides to the evaluation of permanent impairment 6th edition is to be used for a determination of disability, not for disease. In fact, it's presumed if you apply the guides that there may be some disability. But it's not used for disability purposes. But even more importantly, the guides say that a physician is required to do that, not the commission on their own or the arbitrator or Mr. Wiseauer or I. You need to have a physician interpretation of the studies in applying the guides for that to have any value at all. And the reasons are obvious why the guides say that. It's not self-executing. The guides are used for an impairment determination, not an interpretive strategy for the spirometry performed. So in this case, Dr. Paul used CRAPO predictives. That's simply a reference to the cohort that was used to determine what's normal or not normal, what's within the range of normal. It's a certain group of people, theoretically all healthy, normal, without lung disease. Dr. CRAPO was the one that did that study. And from that, then they derived the predictives, the range of normal, et cetera. That's an interpretive strategy. Eagleton used Newtson. Selby used Newtson. The AMA guides actually have the sixth edition, actually have as a preference NHANES-3. And none of the pulmonologists here use that. But that's a strategy to interpret the spirometry versus the guides, which is used to determine impairment, employing one of those strategies. And I'm repeating myself. But in that case, they have a preference for NHANES-3. So I don't want to get confused here. The guides aren't used to pick out necessarily a strategy for how you interpret spirometry. They're used to determine impairment based upon the numbers we have. In regard to the issue of disablement, the evidence is that Dr. Selby found his spirometry to be normal. That was his testimony. He found the diffusion capacity for this gentleman to be reduced. And he attributed that to his obesity. This gentleman had a BMI at the time of Dr. Selby's examination of 55.6. He weighed 360 pounds. He had a reduced total lung capacity in that testing by Dr. Selby. And he again explained that as due to his obesity. This gentleman, in his opinion, was deconditioned. So he found abnormalities in the testing. But he gave a reason for why he believed that they were there. Dr. Nalamuthu, who is a cardiologist for this gentleman, a treating physician, had seen him. And this is in December 2010. So this is before his date of last exposure. But he rendered an opinion that this gentleman's dyspnea on exertion was likely related to his obesity. Pulmonary hypertension and his sleep apnea. He didn't relate it to an occupational disease. What he was saying was consistent with what was later said by Dr. Selby. In the arbitrator's decision under Conclusions of Law, it's 839 in our record. Arbitrator Gallagher set forth the evidence. He gave the testimony of the claimant of Dr. Paul, Dr. Selby, Dr. Meyer, Dr. Wren. And then concluded that the arbitrator finds the opinions of Dr. Selby, Meyer, and Wren, and the NIOSH-B readers to be more persuasive and credible than those of Dr. Paul and Smith. And he recounts in that Conclusion of Law the findings or conclusions of Mr. Wiseau's experts, as well as those that I tended. And he made a credibility, not credibility, he weighed the evidence and made a determination on the evidence that their opinions carried more weight. That was then affirmed by the commissioners, Gorb, Risarto, and Mathis, that then went to the circuit court. I believe it was Montgomery County, and Judge Jarman affirmed it. I think there is sufficient evidence in the record to support that denial. And for that reason, I'd ask that it be affirmed. Thank you. Thank you, Counsel. Counsel, you may reply. Two things I want to convince you of today. One is that Section 1F means something. What it means is that the claimant must prove he had a CWP before Section 1F ran. It also means that if the position of the employer is that there's no CWP, then that X-ray they read had better comply with Section 1F also. It's a mirror image. It fits both parties. Mr. Wert said there's no film after 2012. Well, that's because it was the employer's choice. They could have taken a relevant film. If you'll notice, some of these employers, and this particular one is one of them, if my PFDs are normal, they don't take PFDs. They have a records review. They deprive the commission of data when they think it's their advantage because the PFDs could get worse between my exam and theirs. They get to do that. But they're also required to develop the evidence they need, which is let's get some X-rays after 2012. Sell the exam in 2013. If they'd have done it in 2014, then the X-ray they had would have been relevant under Section 1F. Aren't you placing a burden then on the employer? Not the burden to find disease, but time burdens are on everybody. I've got statutes of limitations I have to do. I have to live under Section 1F. And by the same token, it's a mirror image. The employer, if he wants relevant X-rays, better have them when my guy couldn't develop CWP anymore. But you're suggesting that the employer memorialize evidence potentially could lead to liability down the road. I think the first thing that any lawyer, but particularly a defense lawyer, is going to do is open up that file and look at the timelines. What's the statute of limitations? It's just more than three years, so COPD, NF to CMR out. What's the Section 1F problem this guy's got? Well, when he's looking at it for timelines, he's got to look at it for his own timelines. Now, I remember a time before the case of Sims, it was Freeman, the minor was Sims, in 2013, where three justices, especially a concurring opinion, was that if you have CWP, you have met the statutory definition of disablement as a matter of law. That was brand new. It had not happened before. I have not brought you this 1F argument before. At some time, it's going to be brand new. I believe it will prevail. Hopefully that will be today. But that is my argument, that these timelines are there for both parties, and it's arbitrary to not make them apply to the other side too, particularly when you see that they do develop their cases in such a way that is preferable to them. On the PFTs, not only will they not do PFTs, if mine are normal, if mine are normal except the diffusion capacity, they'll just do a diffusion capacity, not the whole PFTs. That's okay. They get to do that. It's pretty smart. Mr. Wirtz is the guy that does it. He thought of it. Nobody else has caught on to it yet. I hope they don't. But the pendulum swings both ways, and the same thing is true for the X-ray. They've got to watch the data on the X-ray. Here they're left with no X-ray that can prove that this man didn't develop CWP before 1F ran. Now, on these guides for impairment, my big point to you today is not that they prove disease. I don't even care if they prove impairment. What I want to see is they go to the credibility of Dr. Selby. You've got the AMA guides. What does he say? Oh, I rely on Dr. Selby. I don't pay attention to those. And despite the fact that all of them are abnormal. Now, even beyond that, the diffusing capacity was admitted to be abnormal by him. So this man does not have normal PFTs. He's fat. Mr. Wirtz said that eloquently. But being fat can cause you to be short of breath, but it's not the only cause. It's usually multifactorial. Lung disease will cause you to be short of breath, too. And there's no evidence at all in this record. And there's no way there could be evidence to say that his obesity was 100% of his shortness of breath problem. With sleep apnea and hypertension as well. Sure. He can help. When you weigh 370 pounds, you're going to have other problems, too. But also, 31 years in a mine doesn't help. And all I'm asking is to put them all on the table. And all I need is 1%. If any part of it is caused, or even not caused, but aggravated, any part is aggravated, then it qualifies under the PFTs case. Thank you. Thank you, counsel, both for your arguments in this matter. I'll be taking my replies now. This position shall issue.